## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH MULL, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No. _____ |
| v. | |
| GOTHAM DISTRIBUTING CORPORATION AND OLD SCHOOL VENTURES, INC., individually and collectively d/b/a OLDIES.COM, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## CLASS ACTION COMPLAINT

## INTRODUCTION

Joseph Mull ("Plaintiff"), individually and on behalf of all others similarly situated, makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations pertaining specifically to himself or his counsel, which are based on personal knowledge.

## NATURE OF THE CASE

1.    Plaintiff brings this action to redress Defendants' practice of selling, renting, transmitting, and/or otherwise disclosing, to various third parties, records containing the personal information (including names and addresses) of each of their customers, along with detailed information revealing the titles and subject matter of the videos and other audiovisual materials purchased by each customer (collectively "Personal Viewing Information") in violation of the Video Privacy Protection Act, 18 U.S.C. §2710 et seq. ("VPPA").

2.    Defendants violated the VPPA with respect to their disclosure of Plaintiff's and Class members' Personal Viewing Information in two ways.

3.    First, Defendants disclosed their customers' Personal Viewing Information to various third-party recipients, which then appended that information to a myriad of other categories of personal and demographic data pertaining to those customers.    Defendants re-sell that Personal Viewing Information (with the appended demographic information) to other third parties on the open market.

4.      Second, Defendants systematically transmitted (and continue to transmit today) their customers' personally identifying video purchase information to Meta using a snippet of programming code called the "Meta Pixel," which Defendants chose to install and configure on their www.oldies.com website (the "Website").

5.      The information Defendants disclosed (and continue to disclose) to Meta via the Meta Pixel includes the customer's Facebook ID ("FID") and the specific title of the prerecorded video content each of their customers purchased on their Website. An FID is a unique sequence of numbers linked to a specific Meta profile. A Meta profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person).  Entering "Facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds.  Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person.  In the simplest terms, the Meta Pixel installed by Defendants captures and discloses to Meta information that reveals the specific videos that a particular person purchased on Defendants' websites (hereinafter, "Personal Viewing Information").

6.    By these means Defendants disclosed and continue to disclose their customers' Personal Viewing Information to Meta without asking for, let alone obtaining, their consent to these practices.

7.    The VPPA clearly prohibits what Defendants have done.  Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

8.    Thus, while Defendants profit handsomely from their unauthorized disclosures of their customers' Personal Viewing Information to third parties without providing prior notice to or obtaining the requisite consent from any of these customers, they do so at the expense of their customers' privacy and their statutory rights under federal law.

9.    Defendants' practice of disclosing their customers' Personal Viewing Information in violation of the VPPA has invaded Plaintiff's and the other unnamed Class members' privacy and resulted in a barrage of unwanted junk mail to their home addresses and e-mail inboxes.  Defendants' disclosures are also dangerous because they allow for the targeting of particularly vulnerable members of society.  For example, and as a result of Defendants' disclosures of Personal Viewing Information,

any person or entity could buy a list with the names of all men residing in a particular zip code who have spent $100 or more on movies during the past 12 months. Such a list is available for sale for approximately $41.00 and $72.00 per thousand customers listed.

10.    In an era when the collection and monetization of consumer data proliferate on an unprecedented scale, it is important that companies are held accountable for the exploitation of their customers' sensitive information. Defendants chose to disregard Plaintiff's and thousands of other consumers' statutorily protected privacy rights by (a) releasing their Personal Viewing Information into the data-aggregation and brokerage marketplace and (b) directly disseminating such information from their websites to Meta. Accordingly, on behalf of himself and the putative Classes members defined below, Plaintiff brings this Class Action Complaint against Defendants for intentionally and unlawfully disclosing their Personal Viewing Information.

## PARTIES

### I.    Plaintiff Joseph Mull

11.    Plaintiff is, and at all times relevant hereto was, a citizen and resident of Arenzville, Illinois.

12.    Plaintiff is, and at all times relevant hereto was, a user of Meta with a Facebook account which was assigned a unique FID.

13.     On or about August 3, 2023, Plaintiff purchased prerecorded video material from Defendants' website by requesting and paying for such material, providing his name, email address, and home address for shipment of such material. Defendants completed their sale of goods to Plaintiff by shipping the prerecorded video material he purchased to the address he provided in his order.  Accordingly, Plaintiff requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendants on their website.

14.     At all times relevant hereto, including when purchasing, requesting, and obtaining the prerecorded video material from Defendants' website, Plaintiff had a Meta account, a Meta profile, and an FID associated with such profile.

15.     When Plaintiff purchased prerecorded video material from Defendants on their website, Defendants separately disclosed Plaintiff's FID coupled with the specific title of the prerecorded video or video materials he purchased (as well as the URL where such video is available for purchase), among other information concerning Plaintiff and the device on which he used to make the purchase.

16.     To illustrate Defendants' disclosures to Meta, when Plaintiff purchased the "Witchrap" DVD, the specific title of the prerecorded video, the product code: 70946W, and his request to "checkout" and purchase this DVD was transmitted to Meta alongside Plaintiff's FID as seen in the exemplar source code below:

Request URL:    https://www.facebook.com/tr/?batch=1&events[0]=id%3D186027810
7532286%26e%3DSubscribedButtonClick%26d%3Dhttps%253
A%252F%252Fwww.oldies.com%252Fproduct-view%252F70946W.
html%26rl%3Dhttps%253A%252F%252Fwww.oldies.com%252Fsea
rch%252Fresults.cfm%253Fq%253Dwitchtrap%2526results%253D
Products%26if%3Dfalse%26ts%3D1727803143337%26cd%5Bbutt
onFeatures%5D%3D%257B%2522classList%2522%253A%2522ad
d-cart%2520ui%2520left%2520labeled%2520fluid%2520icon%25
20large%2520yellow%2520pill%2520cart%2520button%2522%25
2C%2522destination%2522%253A%2522https%253A%252F%252
Fwww.oldies.com%252Fshopping-cart%252Faddrec.cfm%252Fprod
uc%252F70946W.html%2522%252C%2522id%2522%253A%2522%252
2%252C%2522imageUrl%2522%253A%2522%2522%252C%2522i
nnerText%2522%253A%2522Add%2520to%2520Cart%2522%252
C%2522numChildButtons%2522%253A0%252C%2522tag%2522%
253A%252a%2522%252C%2522type%2522%253Anull%252C%2
522name%2522%253A%2522%2522%257D%26d%5BbuttonTex
t%5D%3DAdd%2520to%2520Cart%26d%5BformFeatures%5D%3
D%255B%255D%26d%5BpageFeatures%5D%3D%257B%2522titl
e%2522%253A%2522Witchtrap%2520DVD%2520(1989)%2520-%
2520MVD%2520Rewind%2520Collection%2520%257C%2520OLDI
ES.com%2522%257D%26sw%3D3008%26sh%3D1692%26v%3D2.
9.169%26rl%3Dstable%26ec%3D2%26o%3D4126%26fbp%3Dfb.1.1
726667945562.93253248248664835O%26ler%3Dempty%26cdl%
3DAPI_unavailable%26it%3D1727803118645%26coo%3Dfalse%26
es%3Dautomatic%26tm%3D3%26exp%3Df3&rqm=GET
Request Method:    GET
Status Code:    🟢 200 OK
Remote Address:    157.240.14.35:443
Referrer Policy:    strict-origin-when-cross-origin

17.    Prior to and at the time he purchased prerecorded video material from Defendants, Defendants did not notify Plaintiff that it would disclose the Personal Viewing Information of their customers generally or that of Plaintiff in particular, and Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendants to disclose his Personal Viewing Information to third parties.  Plaintiff has never been provided any written notice that Defendants sell, rent, license, exchange, or otherwise disclose their customers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information.

18.    Defendants nonetheless sold, rented, transmitted, and/or otherwise disclosed, either directly or through an intermediary or intermediaries, Plaintiff's

Personal Viewing Information – his FID coupled with the specific title of the video he purchased (as well as the URL where such video is available for purchase) to Meta and Plaintiff's name, postal address, e-mail address, gender, age, and income, as well as the particular audio-visual product(s) Plaintiff purchased from Defendants (i.e., the titles of the prerecorded video material purchased) and the amount of money spent by Plaintiff on those purchases – to data miners, data appenders, data aggregators, marketing companies, and/or other third parties, including without limitation NextMark, during the relevant time period.

19.    Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendants to disclose his Personal Viewing Information to Meta or any third party. In fact, Defendants have never even provided Plaintiff with written notice of their practice of disclosing their customers' Personal Viewing Information to Meta or any other third party.

20.    Because Defendants disclosed Plaintiff's Personal Viewing Information (including his FID, the tile of the prerecorded video material he purchased from Defendants' website, and the URL where such video is available for purchase) to Meta and other third parties without prior notice or consent during the applicable statutory period, Defendants violated Plaintiff's rights under the VPPA and invaded his statutorily conferred interest in keeping such information (which bears on his personal affairs and concerns) private.

## II.    Defendant Gotham Distributing Corporation

21.    Defendant Gotham Distributing Corporation ("Defendant Gotham") is a domestic business corporation existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 60 Portland Road, West Conshohocken, Pennsylvania 19428. During the relevant period, Defendant Gotham operated and maintained the Website www.oldies.com, where it sells music CDs, vinyl records, and prerecorded video content including movies and TV shows in the form of DVDs and Blu-rays.

## III.    Defendant Old School Ventures, Inc.

22.    Defendant Old School Ventures, Inc. ("Defendant OSV") is a domestic business corporation existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 203 Windsor Road, Pottstown, PA 19464. During the relevant period, Defendant OSV operated and maintained the Website www.oldies.com, where it sells music CDs, vinyl records, and prerecorded video content including movies and TV shows in the form of DVDs and Blu-rays.

## JURISDICTION AND VENUE

23.    The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

24.     Personal jurisdiction and venue are proper because Defendants maintain their headquarters and principal places of business in Montgomery County, PA, within this judicial District.

## VIDEO PRIVACY PROTECTION ACT

25.     The VPPA prohibits companies (like Defendants) from knowingly disclosing to third parties (like Meta) information that personally identifies consumers (like Plaintiff) as having requested or obtained particular videos or other audio-visual materials.

26.     Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]"  18 U.S.C. § 2710(b)(1).  The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4).  It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider."   18 U.S.C. § 2710(a)(1).  "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).

27.     Leading up to the VPPA's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.*   Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials because such records offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

28.     Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes."  134 Cong. Rec. S5399 (May 10, 1988).   As Senator Leahy explained at the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id.*

29.     While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a more recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

30.     Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[2]

31.     In this case, however, Defendants deprived Plaintiff and numerous other similarly situated persons of that right by systematically (and surreptitiously)

---

[1] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

[2] Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, franken.senate.gov (Jan. 31, 2012).

disclosing their Personal Viewing Information to Meta, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

## BACKGROUND FACTS

### I.    Consumers' Personal Information Has Real Market Value

32.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

33.    Over two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a 26 billion dollar per year online advertising industry in the United States.[4]

34.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be

---

[3] Transcript, *The Information Marketplace* (Mar. 13, 2001), at 8-11, available at https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[4] *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), available at https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.

commercially valuable.  Data is currency.  The larger the data set, the greater potential for analysis – and profit.[5]

35.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

36.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

37.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

---

[5]    Statement  of  FTC  Cmr.  Harbour  (Dec.  7,  2009),  at  2,  available  at https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf

[6]  See M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), available at http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ .

[7] N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), available at https://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html#:~:text=It's%20called%20the%20Acxiom%20Corporation,to%20know%20much%2C%20much%20more.

[8] Letter from Sen. J. Rockefeller IV, Sen. Cmtee. On Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) available at https://www.commerce.senate.gov/services/files/3bb94703-5ac8-4157-a97b-%20a658c3c3061c.

38.    Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

39.    Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs.    Thus, when companies like Defendants share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to

---

[9] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), available at https://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

40.    Disclosures like Defendants' are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]

41.    The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12]

42.    Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.    Thus, information disclosures like Defendants' are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

---

[10] *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times (May 20, 2007), available at https://www.nytimes.com/2007/05/20/business/20tele.html.

[11] *Id*.

[12] Prepared Statement of the FTC on "Fraud Against Seniors" before the Special Committee on Aging, United States Senate (August 10, 2000).
[13] *Id*.

43.     Defendants are not alone in violating their customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties has become a widespread practice.  Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

II.     **Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases**

44.     As the data aggregation industry has grown, so has consumer concerns regarding personal information.

45.     A survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do protect their privacy online.[14]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

46.     Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater

---

[14] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.

[15] *Id.*

value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors. In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[16]

47.    These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[17]

48.    Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18] As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the

---

[16] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), available at https://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

[17] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on Monetizing Privacy* (Feb. 27, 2012), available at https://www.enisa.europa.eu/publications/monetising-privacy.

[18] *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, available at https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf.

customer receives a product or service of less value than the product or service paid for.

### III.    Defendants Unlawfully Sell, Rent, Transmit, And Otherwise Disclose Their Customers' Personal Viewing Information

49.    Defendants maintain a vast digital database comprised of their customers' Personal Viewing Information, including the names and addresses of each customer and information reflecting the titles of specific videos and other audio-visual products that each of their customers has purchased.

50.    During the time period relevant to this action, Defendants have monetized these databases by renting, selling, or otherwise disclosing their customers' Personal Viewing Information to data aggregators, data miners, data brokers, data appenders, and other third parties.

51.    These factual allegations are corroborated by publicly available evidence. For instance, as shown in the screenshot below, the Personal Viewing Information of 212,000 American consumers who purchased Defendants' prerecorded video products, including video cassettes and DVDs, is offered for sale on the website of NextMark, Inc. ("NextMark") – one of many traffickers of this type of Personal Viewing Information – at a base price of "$105.00/M [per thousand records]" (10.5 cents each):



*See* **Exhibit A** hereto.

52.     The "OLDIES.com Mailing list" offered for sale by NextMark, shown in the screenshot above, contains Personal Viewing Information for each of the 212,000 American consumers whose information appears on the list, including each

person's name, postal state and zip code, e-mail address, gender, and age, as well as the prerecorded particular audio-visual product(s) they purchased from Defendants' website (i.e., the titles of the video cassettes and DVDs purchased) and the amount of money they spent on those purchases.

53.     As a result of Defendants' data compiling and sharing practices, companies have obtained and continue to obtain the Personal Viewing Information of Defendants' customers, together with additional sensitive personal information that has been appended thereto by data appenders and others.

54.     Plaintiff is informed and believes, and thereupon alleges, that numerous third parties to whom Defendants have transmitted and/or otherwise disclosed their customers' Personal Viewing Information, either directly or indirectly through an intermediary or intermediaries, have in turn sold, rented, transmitted, or otherwise disclosed that Personal Viewing Information (together with other sensitive personal demographic and lifestyle information appended thereto by data appenders and other entities) to other third parties, including other data brokers, data miners, data appenders, and marketing companies.

55.     Defendants' disclosures of Personal Viewing Information have put their customers at risk of serious harm from scammers.  For example, as a result of Defendants' disclosures of Personal Viewing Information, any person or entity could buy a list with the names of all men residing in a particular zip code who have spent

$100 or more on video cassettes or DVDs during the past 12 months. Such a list is available for sale for approximately $72.00 per thousand customers listed.

56.    Defendants did not seek Plaintiff or any other customers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and their customers remain unaware that their Personal Viewing Information and other sensitive data is being sold, rented and exchanged on the open market.

## IV.    Defendants Use the Meta Pixel to Systematically Disclose Their Customers' Personal Viewing Information to Meta

57.    Separately from, and in addition to, transmitting Plaintiff and the Class members' Personal Viewing Information to data brokers and data appenders, Defendants violated the VPPA by transmitting Plaintiff and the Class members' Personal Viewing Information to Meta through the Pixel technology that Defendants intentionally installed on their website.

### A. The Meta Pixel

58.    On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta".[19] Meta is now the world's largest social media platform. To

---

[19] *See* Facebook, "Company Info," available at https://about.fb.com/company-info./.

create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

59.    The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta. This allows companies like Defendants to build detailed profiles about their customers and to serve them with highly targeted advertising.

60.    Additionally, a Meta Pixel installed on a company's website allows Meta to "match [] website visitors to their respective Facebook User accounts."[20] This is because Meta has assigned to each of their users an "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name[21] – and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor.

---

[20] Meta, "Get Started – Meta Pixel," available at https://developers.facebook.com/docs/meta-pixel/get-started/.

[21] For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

61.    The FID is stored in a small piece of code known as a "cookie" that Meta launches and stores in the internet browsers of each Meta accountholder's device(s) to distinguish between website visitors.[22]

62.    As Meta's developer's guide explains, installing the Meta Pixel on a website allows Meta to track actions that users with Meta accounts take on the site. Meta states that "Examples of [these] actions include adding an item to their shopping cart or making a purchase."[23]

63.    The default configuration of the Meta Pixel, which is what Defendants used, enables website visitor tracking because the Meta Pixel automatically detects first-party cookie data from the particular website that the visitor is on and then matches it with third-party cookie data from Meta such as the c_user cookie that houses a person's FID. [24]

64.    Meta's Business Tools Terms govern the use of Meta's Business Tools, including the Meta Pixel.[25]

---

[22]    Meta, How to Create a Custom Audience from Your Customer List, FACEBOOK FOR BUSINESS, https://www.facebook.com/business/help/471978536642445?id=120537668283214 2 (last visited Nov. 11, 2024).

[23]    Meta,    "About    Meta    Pixel,"    available    at https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[24]    Meta, *Business Help Center: About cookie settings for the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/471978536642445?id=12053766828321 42 (last visited Nov. 11, 2024).

[25] Meta, "Meta Business Tools Terms," available at https://www.facebook.com/legal/technology_terms.

65.    Meta's Business Tools Terms state that website operators may use Meta's Business Tools, including the Meta Pixel, to transmit the "Contact Information" and "Event Data" of their website visitors to Meta.

66.    Meta's Business Tools Terms define "Contact Information" as "information that personally identifies individuals, such as names, email addresses, and phone numbers . . . ."[26]

67.    Meta's Business Tools Terms state: "You instruct us to process the Contact Information solely to match the Contact Information against user IDs [e.g., FIDs] ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data."[27]

68.    The Business Tools Terms define "Event Data" as, *inter alia*, "information that you share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps, and purchases of your products."[28]

69.    Website operators use the Meta Pixel to send information about visitors to their websites to Meta.  Every transmission to Meta accomplished through the Meta

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

Pixel includes at least two elements: (1) the website visitor's FID and (2) the webpage's URL triggering the transmission.

70.    Depending on the configuration of the Meta Pixel, the website may also send Event Data to Meta.  Defendants have configured the Meta Pixel on their Website to send Event Data to Meta.

71.    When website operators make transmissions to Meta through the Meta Pixel, none of the following categories of information are hashed or encrypted: the visitor's FID, the website URL, or the Event Data.

72.    Every website operator installing the Meta Pixel must agree to the Meta Business Tools Terms.[29]

73.    Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

74.    Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed.  Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

---

[29] *See id.*

75.    Simply put, if a company chooses to install the Meta Pixel on their website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track [] the people and type of actions they take,"[30] including, as relevant here, the specific prerecorded video material that they purchase on the website.

**B.  Defendants Knowingly Use the Meta Pixel to Transmit the Personal Viewing Information of Their Customers to Meta**

76.    Defendants sell a wide variety of prerecorded video materials, including movies and TV shows in the form of DVDs and Blu-rays on their website, www.oldies.com.

77.    To purchase prerecorded video material from Defendants' Website, a person must provide at least his or her name, email address, billing address, and credit or debit card (or other form of payment) information.

78.    During the purchase process on Defendants' website, Defendants use – and have used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the person who made the purchase and the specific title of video material that the person purchased (as well as the URL where such video material is available for purchase).

---

[30] Meta, "Retargeting: How to Advertise to Existing Customers with Ads on Facebook," available at https://www.facebook.com/business/goals/retargeting?checkpoint_src=any.

79.     In order to take advantage of the targeted advertising and other informational and analytical services offered by Meta, Defendants intentionally programmed their website (by following step-by-step instructions from Meta's website) to include the Meta Pixel code, which systematically transmits to Meta the FID of each person with a Meta account who purchases prerecorded video material from Defendants' website, along with the specific title of the prerecorded video material that the person purchased.

80.     With only a person's FID and the title of the prerecorded video material (or URL where such material is available for purchase) that the person purchased from Defendants' website—all of which Defendants knowingly and systematically provide to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the title of the specific prerecorded video material that the person purchased (and thus requested and obtained).  This can be accomplished simply by accessing the URL www.facebook.com/ and inserting the person's FID.

81.     Defendants' practice of disclosing the Personal Viewing Information of their customers to Meta continued unabated for the duration of the two-year period preceding the filing of this action.   At all times relevant hereto, whenever Plaintiff or any other person purchased prerecorded video material from Defendants' website, Defendants disclosed to Meta (*inter alia*) the specific title of the video material that was purchased (including the URL where such material is available for purchase),

along with the FID of the person who purchased it (which, as discussed above, uniquely identified the person).

82.    At all times relevant hereto, Defendants knew the Meta Pixel was disclosing their customers' Personal Viewing Information to Meta.

83.    Although Defendants could easily have programmed their website so that none of their customers' Personal Viewing Information is disclosed to Meta, Defendants instead chose to program their website so that all of their customers' Personal Viewing Information is disclosed to Meta.

84.    Before transmitting their customers' Personal Viewing Information to Meta, Defendants failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

85.    By intentionally disclosing to Meta Plaintiff's and their other customers' FIDs together with the specific video material that they each purchased, without any of their consent to these practices, Defendants knowingly violated the VPPA on an enormous scale.

## CLASS ACTION ALLEGATIONS

86.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of himself and seeks to represent two classes of similarly situated persons (the "Classes"), defined as follows:

> **Data Brokerage Class**: All persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material from Defendants and had their Personal Viewing Information disclosed to a third party by Defendants.

> **Meta Pixel Class**: All persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material or services from Defendants' www.oldies.com Website or any of their affiliates' websites while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc.

87.     Excluded from the Classes are any entity in which Defendants have a controlling interest, and officers or directors of Defendants.

88.     Members of each Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Classes number in at least the tens of thousands.   The precise number of members in each Class and their identities are unknown to Plaintiff at this time but may be determined through discovery.   Members of each Class may be notified of the pendency of this action by mail and/or publication through the membership records from Defendants.

89.     Common questions of law and fact exist for all Classes and predominate over questions affecting only individual class members.  Common legal and factual questions include but are not limited to (a) whether Defendants

knowingly disclosed Plaintiff's and Class members' Personal Viewing Information to a third party; (b) whether Defendants embedded the Meta Pixel on their Website that monitors and tracks actions taken by visitors to their Website; (c) whether Defendants report the actions and information of visitors to Meta; (d) whether Defendants knowingly disclosed Plaintiff's and Class members' Personal Viewing Information to Meta; (d) whether Defendants' conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and (e) whether Plaintiff and the Classes are entitled to a statutory damage award of $2,500, as provided by the VPPA.

90.    The named Plaintiff's claims are typical of the claims of the Classes in that the Defendants' conduct toward the putative class is the same.  That is, Defendants knowingly disclosed their customers' Personal Viewing Information to third parties and knowingly embedded the Meta Pixel on their Website to monitor and track actions taken by consumers on their Website and report that to Meta. Further, the named Plaintiff and members of the Classes suffered invasions of their statutorily protected right to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Defendants' uniform and wrongful conduct in intentionally disclosing their Private Purchase Information to Meta.

91.    Plaintiff is an adequate representative of the Classes because he is interested in the litigation; his interests do not conflict with those of the Classes he

seeks to represent; he has retained competent counsel experienced in prosecuting class actions; and he intends to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of all members of each Class.

92.     The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CLAIMS FOR RELIEF

## Count 1: Violation of the Video Privacy Protection Act, (18 U.S.C. § 2710)

93.    Plaintiff repeats the allegations asserted in paragraphs 1-85 as if fully set forth herein.

94.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

95.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]"  Defendants are each a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because they engaged in the business of selling and delivering prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide.

96.    As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider."  As alleged above, Plaintiff and members of the Classes are each a "consumer" within the meaning of the VPPA because they each purchased prerecorded video material from Defendants' website that was sold and delivered to them by Defendants.

97.     As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Personal Viewing Information that Defendants transmitted to third parties, including Meta, constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and members of the Classes as an individual who purchased, and thus "requested or obtained," specific prerecorded video material from Defendants via their website.

98.     Defendants knowingly disclosed Plaintiff's and Data Brokerage Class members' Personal Viewing Information to data aggregators, data brokers, data appenders because Defendants knowingly rented, sold, or otherwise disclosed their customers' Personal Viewing Information to data aggregators, data miners, data brokers, data appenders, and other third parties.

99.     Further, Defendants knowingly disclosed Plaintiff's and Meta Pixel Class members' Personal Viewing Information to Meta via the Meta Pixel technology because Defendants intentionally installed and programmed the Meta Pixel code on their website, knowing that such code would transmit to Meta the titles of the video materials purchased by its customers coupled with their customers' unique identifiers (including FIDs).

100.    Defendants failed to obtain informed written consent from Plaintiff or members of the Classes authorizing Defendants to disclose their Personal Viewing Information to Meta or any third party. More specifically, at no time prior to or during the applicable statutory period did Defendants obtain from any person who purchased prerecorded video material or services from their Website (including Plaintiff or members of the Classes) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendants provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

101.    By disclosing Plaintiff's and members of the Classes' Personal Viewing Information, Defendants violated their statutorily protected right to privacy in their Personal Viewing Information.

102.    Consequently, Defendants are liable to Plaintiff and members of the Classes for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendants as follows:

a) For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representatives of the Classes and Plaintiff's attorneys as Class Counsel to represent the Classes;

b) For an order declaring that Defendants' conduct as described herein violated the VPPA;

c) For an order finding in favor of Plaintiff and the Classes and against Defendants on all counts asserted herein;

d) For an award of $2,500.00 to Plaintiff and members of the Classes, as provided by 18 U.S.C. § 2710(c);

e) For an order permanently enjoining Defendants from disclosing the Personal Viewing Information of their customers to third parties in violation of the VPPA;

f) For prejudgment interest on all amounts awarded; and

g) For an order awarding punitive damages, reasonable attorneys' fees, and costs to counsel for Plaintiff and the Classes under Rule 23 and 18 U.S.C. § 2710(c).

Respectfully submitted,

Dated: November 13, 2024

/s/ *William E. Hoese*
William E. Hoese
Elias A. Kohn
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700
Facsimile: (215) 238-1986
whoese@kohnswift.com
ekohn@kohnswift.com

and

Elliot O. Jackson
Florida Bar No. 1034536
HEDIN LLP
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone:   (305) 357-2107
Facsimile:    (305) 200-8801
ejackson@hedinllp.com

*Counsel for Plaintiff and Putative*
*Classes*

Ex. A

①Start  ②Results  ③Data Card  ④Request  ⑤Finished

# OLDIES.com Mailing List

Mail order buyers of compact discs, cassette tapes, vinyl records, video cassettes, DVDs and books.

[ Get Count ]   [ Get Pricing ]   [ Get More Information ]

| SEGMENTS | COUNTS THROUGH 02/20/2024 |
|---|---|
| 212,000 TOTAL UNIVERSE / BASE RATE | $105.00/M |
| 15,000 3 MONTH BUYERS | + $21.00/M |
| 32,000 6 MONTH BUYERS | + $16.00/M |
| 91,000 12 MONTH BUYERS | + $10.00/M |
| 180,000 24 MONTH BUYERS | $105.00/M |
| 42,200 12 MONTH MUSIC BUYERS | + $21.00/M |
| 30,000 12 MONTH MOVIE BUYERS | + $21.00/M |
| 10,000 12 MONTH VINYL BUYERS | + $21.00/M |
| NON-PROFIT/PUBLISHING | $75.00/M |

| | |
|---|---|
| POPULARITY: | ▪▪▪▪▪ 99 |
| MARKET: | CONSUMER |
| CHANNELS: | 🖼 |
| SOURCE: | DIRECT MAIL SOLD |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA |
| GENDER: | 80% MALE |
| SPENDING: | $65.00 AVERAGE ORDER |

### DESCRIPTION

OLDIES.com, a hybrid retailer with over 40 years of expertise, has established itself as the premier destination for music and movie enthusiasts seeking the nostalgic and the rare. Blending the convenience of online retail with direct-to-consumer catalog distribution, they specialize in offering a wide array of physical media including Audio CDs, Vinyl Records, DVDs, Blu-rays, and 4K UHD.

What sets their list apart is their audience: discerning collectors and aficionados, primarily males aged 55 and above, who not only cherish music and movies, but also demonstrate a strong purchasing power with an average spend of $65 per order. By renting the Oldies.com mailing list, your mailers' message will reach the hands of these enthusiasts.

Their customers are loyal, engaged, and passionate about their collections, making them an ideal audience for brands that value heritage, quality, and exclusivity. Whether your mailers' offer aligns with nostalgia, luxury, or a specific lifestyle, this list offers a unique channel to reach a targeted, receptive audience.

List Owner requires reciprocity. List Owner does not permit bind-ins/blow-ins without advance agreement and compensation. List Owner will not approve Last Chance or other promotional response.

Processed orders cancelled before the original mail date incur a $100 flat fee plus $15/M run charges, full selection fees, material and shipping

### SELECTS

| | |
|---|---|
| $100+ BUYERS | $41.00/M |
| $50+ BUYERS | $21.00/M |
| $75+ BUYERS | $31.00/M |
| 12 MONTH RECENCY | $10.00/M |
| 3 MONTH RECENCY | $21.00/M |
| 6 MONTH RECENCY | $16.00/M |
| BOOK BUYERS | $11.00/M |
| GIFT AND COLLECTIBLE BUYERS | $11.00/M |
| MOVIE BUYERS | $11.00/M |
| MUSIC BUYERS | $11.00/M |
| STATE | $11.00/M |
| VINYL BUYERS | $11.00/M |
| ZIP | $11.00/M |

### ADDRESSING

| | |
|---|---|
| KEY CODING | NOT AVAILABLE |
| E-MAIL | $75.00/F |
| FTP | $75.00/F |
| RUSH FEE | $100.00/F |

### RELATED LISTS

- THE SATURDAY EVENING POST
- AMERICAN DIABETES ASSOCIATION DONORS
- MEDALS OF AMERICA
- CONSUMER REPORTS AGE 50+ SUBSCRIBERS
- GARRETT WADE CATALOG
- BIOTECH RESEARCH PRODUCTS EMAIL/POSTAL/PHONE
- UPPER ROOM LARGE PRINT MAGAZINE
- SWEEPSTAKES CLEARINGHOUSE MERCHANDISE BUYERS
- ACLU- AMERICAN CIVIL LIBERTIES UNION(C4)
- AMERICAN LUNG ASSOCIATION DONOR MASTERFILE

costs. Orders cancelled after the original mail date are due in full at
gross.

EMG acts only as Agent on behalf of the List Owner and does not
guarantee the data nor the results of any mailing.

**ORDERING INSTRUCTIONS**

- To order this list, contact your List Broker and ask for NextMark List ID
  #57555 or click here to place your request.
- Use NextMark List Order Entry Software or Bionic Media Planning Software
- 5,000 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT
- 85% NET NAME AVAILABLE ON ORDERS OF 50,000 OR MORE ($8.00/M RUN
  CHARGE)
- PLEASE INQUIRE ABOUT EXCHANGE
- REUSE IS AVAILABLE
- CANCELLATION FEE AT $100.00/F

[ Get Count ]  [ Get Pricing ]  [ Get More Information ]