## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH MULL, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>GOTHAM DISTRIBUTING CORPORATION, MVD ENTERTAINMENT GROUP, and OLD SCHOOL VENTURES, INC., individually and collectively d/b/a OLDIES.COM,<br><br>        Defendants. | Case No. 2:24-cv-06083-GJP<br><br><br>**DEMAND FOR JURY TRIAL** |

## FIRST AMENDED CLASS ACTION COMPLAINT

**INTRODUCTION**

Joseph Mull ("Plaintiff"), individually and on behalf of all others similarly situated, makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations pertaining specifically to himself or his counsel, which are based on personal knowledge.

**NATURE OF THE CASE**

1.     Plaintiff brings this action to redress Defendants' practice of Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc. ("Facebook"), selling, renting, transmitting, and/or otherwise disclosing, to various third parties, records containing the personal information (including names and addresses) of each of their customers, along with detailed information revealing the titles and subject matter of the videos and other audiovisual materials purchased by each customer (collectively "Personal Viewing Information") in violation of the Video Privacy Protection Act, 18 U.S.C. §2710 et seq. ("VPPA").

2.     Defendants violated the VPPA with respect to their disclosure of Plaintiff's and Class members' Personal Viewing Information in two ways.

3.     First, Defendants disclosed information that reveals the specific videos that a particular person (identified by, *inter alia*, name and address) purchased on Defendants' websites (hereinafter, "Personal Viewing Information") to various third parties, including data appenders, data aggregators, data brokers, data cooperatives,

aggressive marketing companies, and various third party renters and exchangers of this data.

4. Second, Defendants systematically transmitted (and continue to transmit today) their customers' Personal Viewing Information to Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc. ("Facebook") using a snippet of programming code called the "Meta Pixel," which Defendants chose to install and configure on their www.oldies.com website (the "Website"). The information Defendants disclosed (and continue to disclose) to Meta via the Meta Pixel includes the customer's Facebook ID ("FID") and the specific title of the prerecorded video content each of their customers purchased on their Website. An FID is a unique sequence of numbers linked to a specific Meta profile. A Meta profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person). Entering "Facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds. Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person. In the simplest terms, the Meta Pixel installed by Defendants captures and discloses to Meta the Personal Viewing Information of Defendants' customers.

5.    Defendants disclosed and continue to disclose their customers' Personal Viewing Information to these various third parties without asking for, let alone obtaining, their customers' consent to these practices.

6.    The VPPA clearly prohibits what Defendants have done.  Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

7.    Thus, while Defendants profit handsomely from their unauthorized disclosures of their customers' Personal Viewing Information to third parties without providing prior notice to or obtaining the requisite consent from any of their customers, they do so at the expense of their customers' privacy and their statutory rights under federal law.

8.    Defendants' practice of disclosing their customers' Personal Viewing Information in violation of the VPPA has invaded Plaintiff's and the other unnamed Class members' privacy and resulted in a barrage of unwanted junk mail to their home addresses and e-mail inboxes.

9.    In an era when the collection and monetization of consumer data proliferate on an unprecedented scale, it is important that companies are held

accountable for the exploitation of their customers' sensitive information. Defendants chose to disregard Plaintiff's and thousands of other consumers' statutorily protected privacy rights by intentionally and knowingly disclosing their Personal Viewing Information to third parties in the data-aggregation and brokerage marketplace and to Meta. Accordingly, on behalf of himself and the putative Class members defined below, Plaintiff brings this First Amended Class Action Complaint against Defendants to put a stop to and obtain redress for their violations of VPPA.

## PARTIES

### I.    Plaintiff Joseph Mull

10.    Plaintiff is, and at all times relevant hereto was, a citizen and resident of Arenzville, Illinois.

11.    Plaintiff is, and at all times relevant hereto was (including when purchasing, requesting, and obtaining the prerecorded video material from Defendants' website), a user of Meta with a Facebook account and profile which was assigned a unique FID.

12.    On or about August 3, 2023, Plaintiff purchased prerecorded video material from Defendants' oldies.com website by requesting and paying for such material, providing his name, email address, and home address for shipment of such material. Defendants completed their sale of goods to Plaintiff by shipping the prerecorded video material he purchased to the address he provided in his order.

Accordingly, Plaintiff requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendants on their website.

13.    Prior to and at the time he purchased prerecorded video material from Defendants' oldies.com website, Defendants did not notify Plaintiff that it would disclose the Personal Viewing Information of their customers generally or that of Plaintiff in particular, and Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendants to disclose his Personal Viewing Information to third parties. Plaintiff has never been provided any written notice that Defendants sell, rent, license, exchange, or otherwise disclose their customers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information.

14.    Nonetheless, when Plaintiff purchased prerecorded video material from Defendants on their oldies.com website, Defendants disclosed to Meta Plaintiff's FID coupled with the specific title of the prerecorded video or video materials he purchased (as well as the URL where such video is available for purchase), among other information concerning Plaintiff and the device on which he used to make the purchase.

15.    Additionally, following Plaintiff's purchases of prerecorded video materials on Defendants' oldies.com website, Defendants sold, rented, exchanged for data pertaining to other companies' customers, transmitted, and/or otherwise

disclosed Plaintiff's Personal Viewing Information to data appenders, data aggregators, data brokers, data cooperatives, aggressive marketing companies, and various third party renters and exchangers of this data (anyone who wanted to acquire it).

16.    Because    Defendants    disclosed    Plaintiff's    Personal    Viewing Information to Meta and numerous other third parties without prior notice or consent during the applicable statutory period, Defendants violated Plaintiff's rights under the VPPA and invaded his statutorily conferred interest in keeping such information (which bears on his personal affairs and concerns) private.

## II.    Defendant Gotham Distributing Corporation

17.    Defendant Gotham Distributing Corporation ("Defendant Gotham") is a domestic business corporation existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 60 Portland Road, West Conshohocken, Pennsylvania 19428.

## III.    Defendant MVD Entertainment Group

18.    Defendant MVD Entertainment Group ("Defendant MVD") is a domestic business corporation existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 203 Windsor Road, Pottstown, PA 19464.    Defendant MVD owns and operates a full-service music and movie distribution firm from a 30,000-square-foot warehouse.

## IV.    Defendant Old School Ventures, Inc.

19.    Defendant OSV is a domestic business corporation existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at Defendant MVD's former headquarters, 203 Windsor Road, Pottstown, PA 19464.

20.    In or around 2023, Defendants Gotham and MVD entered into a joint enterprise to form a new music and film direct-to-consumer business under the name Old School Ventures, Inc. ("Defendant OSV").  Thus, since March 29, 2023, Defendants Gotham and MVD have jointly owned, operated, controlled, and directed every aspect of Defendant OSV's business and day-to-day activities, including the sale of prerecorded video materials to consumers on the oldies.com website and the disclosures of oldies.com customers' Personal Viewing Information to third parties, including to Meta and to the various renters, exchangers, and purchasers of lists containing customers' Personal Viewing Information. Accordingly, since March 29, 2023, Defendant OSV has exercised no independent control over its business activities, but rather has operated as a mere conduit of Defendants Gotham and MVD, under their exclusive control and direction, for the purpose of enabling the two companies to collectively sell their respective products to consumers and to then monetize, by way of the disclosures alleged herein, the Personal Viewing Information of the persons who purchased those products.

21.    Indeed, the "Privacy Policy"[1] accessible on the oldies.com website states (and stated during the relevant period) that "[t]he terms "OLDIES.com," "we," and "us" include **Old School Ventures, Inc. d/b/a OLDIES.com and our affiliates and subsidiaries**," and that "[t]his Policy applies to all OLDIES.com's **operating divisions, subsidiaries, affiliates, and branches, any additional subsidiary, affiliate, or branch of OLDIES.com that we may subsequently form**."[2]    The Privacy Policy also states that "[t]hrough our Services, **OLDIES.com may** allow Third-Party advertising partners to set tracking tools (e.g., cookies) to collect information regarding your activities (e.g., your IP address, page(s) visited, time of day). **We may** also share such de-identified information as well as selected Personal Information (such as demographic information and past purchase history) we have collected with Third-Party advertising partners."[3]    The Privacy Policy further states that "**[w]e may** allow access to other data collected by the Site to facilitate transmittal of information that may be useful, relevant, valuable or otherwise of interest to you," and that "**OLDIES.com may** share Personal Information with our business partners, and affiliates for our and our affiliates' internal business purposes or to provide you

---

[1]    Notably, at no time prior to a customer purchasing a product from Defendants' oldies.com website is the customer put on notice of the Privacy Policy or asked to agree to the Privacy Policy; accordingly, neither Plaintiff nor any other Class member manifested their assent to the terms of the oldies.com Privacy Policy.

[2]    https://www.oldies.com/about/privacy.cfm.

[3]    *Id.*

with a product or service that you have requested."[44]

22.     Thus, during the relevant period, Defendants Gotham and MVD (including through their joint venture known as Defendant OSV) have collectively operated, maintained, overseen, and directed and controlled all business conducted via the website oldies.com, including the sales of prerecorded video materials to consumers, as well as all of the disclosures of oldies.com customers' Personal Viewing Information at issue in this case.

## JURISDICTION AND VENUE

23.     The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

24.     Personal jurisdiction and venue are proper because Defendants maintain their headquarters and principal places of business in Montgomery County, PA, within this judicial District.

## VIDEO PRIVACY PROTECTION ACT

25.     The VPPA prohibits companies (like Defendants) from knowingly disclosing to third parties information that personally identifies consumers (like Plaintiff) as having requested or obtained particular videos or other audio-visual materials.

---

[44]     *Id.*

26.     Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]"  18 U.S.C. § 2710(b)(1).  The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4).  It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).

27.     Leading up to the VPPA's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes."  *Id.*   Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials because such records offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems

is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

28.    Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes." 134 Cong. Rec. S5399 (May 10, 1988).   As Senator Leahy explained at the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

29.    While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a more recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,'

mobile apps and other new technologies have revolutionized the availability of Americans' information."[5]

30.    Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[6]

31.    In this case, however, Defendants deprived Plaintiff and numerous other similarly situated persons of that right by systematically (and surreptitiously) disclosing their Personal Viewing Information to various third parties, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

## BACKGROUND FACTS

### I.    Consumers' Personal Information Has Real Market Value

32.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity

---

[5] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

[6] Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, franken.senate.gov (Jan. 31, 2012).

to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[7]

33.    Over two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a 26 billion dollar per year online advertising industry in the United States.[8]

34.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable.  Data is currency.  The larger the data set, the greater potential for analysis – and profit.[9]

35.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about

---

[7] Transcript, *The Information Marketplace* (Mar. 13, 2001), at 8-11, available at https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[8] *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal  (Feb.  28,  2011),  available  at https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.

[9]    Statement  of  FTC  Cmr.  Harbour  (Dec.  7,  2009),  at  2,  available  at https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf

consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[10]

36.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[11]

37.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[12]

38.     Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

---

[10] *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), available at http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ .

[11] N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), available at https://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html#:~:text=It's%20called%20the%20Acxiom%20Corporation,to%20know%20much%2C%20much%20more.

[12] Letter from Sen. J. Rockefeller IV, Sen. Cmtee. On Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) available at https://www.commerce.senate.gov/services/files/3bb94703-5ac8-4157-a97b-%20a658c3c3061c.

By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[13]

39.    Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs.    Thus, when companies like Defendants share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[14]

40.    Disclosures like Defendants' are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they

---

[13] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), available at https://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

[14] *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times (May 20, 2007), available at https://www.nytimes.com/2007/05/20/business/20tele.html.

are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[15]

41. The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[16]

42. Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Defendants' are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[17]

43. Defendants are not alone in violating their customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer information to data aggregators, data appenders, data cooperatives, direct marketers, Meta, and other third parties has become a widespread practice across various consumer products industries. Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

---

[15] *Id.*

[16] Prepared Statement of the FTC on "Fraud Against Seniors" before the Special Committee on Aging, United States Senate (August 10, 2000).
[17] *Id.*

## II.    Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

44.    As the data aggregation industry has grown, so has consumer concerns regarding personal information.

45.    A survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do protect their privacy online.[18]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[19]

46.    Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.  In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[20]

---

[18] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.

[19] *Id.*

[20] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), available at https://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

47.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[21]

48.     Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[22] As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

## III.    Defendants Unlawfully Sell, Rent, Transmit, And Otherwise Disclose Their Customers' Personal Viewing Information

49.     Defendants maintain a vast digital database comprised of their customers' Personal Viewing Information, including the names and addresses of

---

[21] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on Monetizing Privacy* (Feb. 27, 2012), available at https://www.enisa.europa.eu/publications/monetising-privacy.

[22] *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, available at https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf.

each customer and information reflecting the titles of specific videos and other audio-visual products that each of their customers has purchased.

50.    During the time period relevant to this action, Defendants have monetized these databases by renting, selling, or otherwise disclosing their customers' Personal Viewing Information to data appenders, data aggregators, data brokers, data cooperatives, aggressive marketing companies, and various third party renters and exchangers of this data.

51.    These factual allegations are corroborated by publicly available evidence. For instance, as shown in the screenshot below, the Personal Viewing Information of 212,000 American consumers who purchased Defendants' prerecorded video products, including video cassettes and DVDs, is offered for sale by Defendants in a "data card" posted by Defendants on the website of NextMark, Inc. ("NextMark") at a base price of "$105.00/M [per thousand records]" (10.5 cents each):



*See* **Exhibit A** hereto.

52.    The "OLDIES.com Mailing list" that Defendants have advertised for rental, sale, and exchange on NextMark, shown in the screenshot above, contains the Personal Viewing Information of each of the 212,000 consumers whose information appears on the list, including each person's name and address as well as the particular prerecorded audio-visual product(s) they purchased from Defendants' website (i.e., the titles of the video cassettes and DVDs purchased) and the amount of money they spent on those purchases.

53.     During the relevant time period, Defendants have rented, sold, and exchanged lists containing their customers' Personal Viewing Information to various third parties interested in acquiring this data, including data appenders, data aggregators, data brokers, data cooperatives, aggressive marketing companies, and various third party renters and exchangers of this data.

54.     Defendants did not seek Plaintiff's or any other customers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) to these third parties, and their customers remain unaware that their Personal Viewing Information and other sensitive data is being sold, rented and exchanged on the open market in this way.

55.     By renting, selling, exchanging for, or otherwise disclosing lists containing their customers' Personal Viewing Information to third parties, Defendants knowingly violated the VPPA on an enormous scale.

### IV.    Defendants Use the Meta Pixel to Systematically Disclose Their Customers' Personal Viewing Information to Meta

56.     Additionally, throughout the relevant time period, Defendants violated the VPPA by systematically transmitting Plaintiff's and the Class members' Personal Viewing Information to Meta through the Pixel technology that Defendants intentionally installed on their oldies.com website.

**The Meta Pixel**

57.    On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta".[23]  Meta is now the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

58.    The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta. This allows companies like Defendants to build detailed profiles about their customers and to serve them with highly targeted advertising.

59.    Additionally, a Meta Pixel installed on a company's website allows Meta to "match [] website visitors to their respective Facebook User accounts."[24] This is because Meta has assigned to each of their users an "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name[25] – and because each transmission of information

---

[23] *See* Facebook, "Company Info," available at https://about.fb.com/company-info./.

[24] Meta, "Get Started – Meta Pixel," available at https://developers.facebook.com/docs/meta-pixel/get-started/.

[25] For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

made from a company's website to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor.

60.     The FID is stored in a small piece of code known as a "cookie" that Meta launches and stores in the internet browsers of each Meta accountholder's device(s) to distinguish between website visitors.[26]

61.     As Meta's developer's guide explains, installing the Meta Pixel on a website allows Meta to track actions that users with Meta accounts take on the site. Meta states that "Examples of [these] actions include adding an item to their shopping cart or making a purchase."[27]

62.     The default configuration of the Meta Pixel, which is what Defendants used, enables website visitor tracking because the Meta Pixel automatically detects first-party cookie data from the particular website that the visitor is on and then matches it with third-party cookie data from Meta such as the c_user cookie that houses a person's FID.[28]

---

[26]     Meta, How to Create a Custom Audience from Your Customer List, FACEBOOK FOR BUSINESS, https://www.facebook.com/business/help/471978536642445?id=120537668283214 2 (last visited Nov. 11, 2024).

[27]     Meta,          "About          Meta          Pixel,"          available          at https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[28]     Meta, *Business Help Center: About cookie settings for the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/471978536642445?id=12053766828321 42 (last visited Nov. 11, 2024).

63.    Meta's Business Tools Terms govern the use of Meta's Business Tools, including the Meta Pixel.[29]

64.    Meta's Business Tools Terms state that website operators may use Meta's Business Tools, including the Meta Pixel, to transmit the "Contact Information" and "Event Data" of their website visitors to Meta.

65.    Meta's Business Tools Terms define "Contact Information" as "information that personally identifies individuals, such as names, email addresses, and phone numbers . . . ."[30]

66.    Meta's Business Tools Terms state: "You instruct us to process the Contact Information solely to match the Contact Information against user IDs [e.g., FIDs] ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data."[31]

67.    The Business Tools Terms define "Event Data" as, *inter alia*, "information that you share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps, and purchases of your products."[32]

---

[29] Meta, "Meta Business Tools Terms," available at https://www.facebook.com/legal/technology_terms.
[30] *Id.*

[31] *Id.*

[32] *Id.*

68.    Website operators use the Meta Pixel to send information about visitors to their websites to Meta.  Every transmission to Meta accomplished through the Meta Pixel includes at least two elements: (1) the website visitor's FID and (2) the webpage's URL triggering the transmission.

69.    Depending on the configuration of the Meta Pixel, the website may also send Event Data to Meta.  Defendants have configured the Meta Pixel on the oldies.com website to send Event Data to Meta.

70.    When website operators make transmissions to Meta through the Meta Pixel, none of the following categories of information are hashed or encrypted: the visitor's FID, the website URL, or the Event Data.

71.    Every website operator installing the Meta Pixel must agree to the Meta Business Tools Terms.[33]

72.    Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

73.    Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed.  Meta then monetizes this Orwellian database by selling advertisers the

---

[33] *See id.*

ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

74.    Simply put, if a company chooses to install the Meta Pixel on their website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track [] the people and type of actions they take,"[34] including, as relevant here, the specific prerecorded video material that they purchase on the website.

### A. Defendants Knowingly Use the Meta Pixel to Transmit the Personal Viewing Information of Their Customers to Meta

75.    To purchase prerecorded video material from Defendants' oldies.com website, a person must provide at least his or her name, email address, billing address, and credit or debit card (or other form of payment) information.

76.    During the purchase process on Defendants' website, Defendants use – and have used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the person who made the purchase and the specific title of video material that the person purchased (as well as the URL where such video material is available for purchase).

---

[34] Meta, "Retargeting: How to Advertise to Existing Customers with Ads on Facebook," available at https://www.facebook.com/business/goals/retargeting?checkpoint_src=any.

77.    In order to take advantage of the targeted advertising and other informational and analytical services offered by Meta, Defendants intentionally programmed their oldies.com website (by following step-by-step instructions from Meta's website) to include the Meta Pixel code, which systematically transmits to Meta the FID of each person with a Meta account who purchases prerecorded video material from Defendants' website, along with the specific title of the prerecorded video material that the person purchased.

78.    With only a person's FID and the title of the prerecorded video material (or URL where such material is available for purchase) that the person purchased from Defendants' oldies.com website—all of which Defendants knowingly and systematically provide to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the title of the specific prerecorded video material that the person purchased (and thus requested and obtained).  This can be accomplished simply by accessing the URL www.facebook.com/ and inserting the person's FID.

79.    Defendants' practices of disclosing the Personal Viewing Information of their customers to Meta continued unabated for the duration of the two-year period preceding the filing of this action.   At all times relevant hereto, whenever Plaintiff or any other person purchased prerecorded video material from Defendants' website, Defendants disclosed to Meta (*inter alia*) the specific title of the video material that

was purchased (including the URL where such material is available for purchase), along with the FID of the person who purchased it (which, as discussed above, uniquely identified the person).

80.    To illustrate Defendants' disclosures to Meta, when Plaintiff purchased the "Witchtrap" DVD, the specific title of the prerecorded video, the product code: 70946W, and his request to "checkout" and purchase this DVD was transmitted to Meta alongside Plaintiff's FID as seen in the exemplar source code below:

| Request URL: | https://www.facebook.com/tr/?batch=1&events[0]=id%3D186027810 |
|---|---|
| | 7532286%26ev%3DSubscribedButtonClick%26dl%3Dhttps%253 |
| | A%252F%252Fwww.oldies.com%252Fproduct-view%252F70946W. |
| | html%26rl%3Dhttps%253A%252F%252Fwww.oldies.com%252Fsea |
| | rch%252Fresults.cfm%253Fq%253Dwitchtrap%2526results%253D |
| | Products%26if%3Dfalse%26ts%3D1727803143337%26cd%5Bbutt |
| | onFeatures%5D%3D%257B%2522classList%2522%253A%2522ad |
| | d-cart%2520ui%2520left%2520labeled%2520fluid%2520icon%25 |
| | 20large%2520yellow%2520pill%2520cart%2520button%2522%25 |
| | 2C%2522destination%2522%253A%2522https%253A%252F%252 |
| | Fwww.oldies.com%252Fshopping-cart%252Faddrec.cfm%252Fprod |
| | uct_70946W.html%2522%252C%2522id%2522%253A%2522%252 |
| | 2%252C%2522imageUrl%2522%253A%2522%2522%252C%2522i |
| | nnerText%2522%253A%2522Add%2520to%2520Cart%2522%252 |
| | C%2522numChildButtons%2522%253A0%252C%2522tag%2522% |
| | 253A%2522a%2522%252C%2522type%2522%253Anull%252C%2 |
| | 522name%2522%253A%2522%2522%257D%26cd%5BbuttonTex |
| | t%5D%3DAdd%2520to%2520Cart%26cd%5BformFeatures%5D%3 |
| | D%255B%255D%26cd%5BpageFeatures%5D%3D%257B%2522titl |
| | e%2522%253A%2522Witchtrap%2520DVD%2520(1989)%2520-% |
| | 2520MVD%2520Rewind%2520Collection%2520%257C%2520OLDI |
| | ES.com%2522%257D%26sw%3D300%26sh%3D1692%26v%3D2. |
| | 9.169%26r%3Dstable%26ec%3D2%26o%3D4126%26fbp%3Dfb.1.1 |
| | 726667945562.93253248248664835 0%26ler%3Dempty%26cdl% |
| | 3DAPI_unavailable%26it%3D1727803118645%26coo%3Dfalse%26 |
| | es%3Dautomatic%26tm%3D3%26exp%3Df3&rqm=GET |
| Request Method: | GET |
| Status Code: | 🟢 200 OK |
| Remote Address: | 157.240.14.35:443 |
| Referrer Policy: | strict-origin-when-cross-origin |

81.    At all times relevant hereto, Defendants knew the Meta Pixel was disclosing their customers' Personal Viewing Information to Meta.

82.    Although Defendants could easily have programmed their website so that none of their customers' Personal Viewing Information is disclosed to Meta, Defendants instead chose to program their website so that all of their customers' Personal Viewing Information is disclosed to Meta.

83.    Before transmitting their customers' Personal Viewing Information to Meta, Defendants failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

84.    By intentionally disclosing to Meta Plaintiff's and their other customers' FIDs along with the titles of the specific video materials that they each purchased, without any of their consent to these practices, Defendants knowingly violated the VPPA on an enormous scale.

## CLASS ACTION ALLEGATIONS

85.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of himself and seeks to represent two classes of similarly situated persons (the "Classes"), defined as follows:

> **Data Brokerage Class**: All persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material from Defendants and had their Personal Viewing Information disclosed by Defendants to a third party.

> **Meta Pixel Class**: All persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material from the oldies.com website and had their Personal Viewing Information disclosed by Defendants to Meta via the Meta Pixel technology.

86.    Excluded from the Classes are any entity in which Defendants have a controlling interest, and officers or directors of Defendants.

87.    Members of each Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Classes number in at least the tens of thousands.  The precise number of members in each Class and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Members of each Class may be notified of the pendency of this action by mail and/or publication through the membership records from Defendants.

88.    Common questions of law and fact exist for all Classes and predominate over questions affecting only individual class members.  Common legal and factual questions include but are not limited to (a) whether Defendants knowingly disclosed Plaintiff's and Class members' Personal Viewing Information to a third party; (b) whether Defendants' conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and (c) whether Plaintiff and the Classes are entitled to a statutory damage award of $2,500, as provided by the VPPA.

89.    The named Plaintiff's claims are typical of the claims of the Classes in that the Defendants' conduct toward the putative class is the same.  That is, Defendants knowingly disclosed the Personal Viewing Information of the members of each of the Classes to third parties in the same way.  Further, the named Plaintiff and members of the Classes all suffered invasions of their statutorily protected right

to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Defendants' uniform and wrongful conduct in intentionally disclosing their Private Purchase Information to third parties.

90.     Plaintiff is an adequate representative of each of the Classes because he is interested in the litigation; his interests do not conflict with those of the Classes he seeks to represent; he has retained competent counsel experienced in prosecuting class actions; and he intends to prosecute this action vigorously.   Plaintiff and his counsel will fairly and adequately protect the interests of all members of the Classes.

91.     The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues.    Individualized litigation also presents a potential for inconsistent or contradictory judgments.   In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment

of the liability issues will ensure that all claims and claimants are before this Court

for consistent adjudication of the liability issues.

## CLAIM FOR RELIEF

### Violation of the Video Privacy Protection Act, (18 U.S.C. § 2710)
**(By Plaintiff, Individually and on Behalf of Members of Both Classes, Against Defendants)**

92.    Plaintiff repeats the allegations asserted in the foregoing paragraphs as

if fully set forth herein.

93.    The VPPA prohibits a "video tape service provider" from knowingly

disclosing "personally identifying information" concerning any "consumer" to a

third party without the "informed, written consent (including through an electronic

means using the Internet) of the consumer." 18 U.S.C. § 2710.

94.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider"

is "any person, engaged in the business, in or affecting interstate or foreign

commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar

audiovisual materials[.]"  Defendants are "video tape service providers" as defined

in 18 U.S.C. § 2710(a)(4) because they engaged in the business of selling and

delivering prerecorded video materials, similar to prerecorded video cassette tapes,

to consumers nationwide.

95.    As set forth in 18 U.S.C. § 2710(a)(1), a "'consumer' means any

renter, purchaser, or consumer of goods or services from a video tape service

provider."  As alleged above, Plaintiff and members of the Classes are each a

"consumer" within the meaning of the VPPA because they each purchased prerecorded video material from Defendants and such material was sold and delivered to them by Defendants.

96.    As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Personal Viewing Information that Defendants transmitted to the third parties alleged above constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and members of the Classes as an individual who purchased, and thus "requested or obtained," specific prerecorded video material from Defendants via their oldies.com website.

97.    Defendants knowingly disclosed Plaintiff's and the Data Brokerage Class members' Personal Viewing Information to data appenders, data aggregators, data brokers, data cooperatives, aggressive marketing companies, and various third party renters and exchangers of this data.  Defendants made such disclosures in exchange for money and/or other valuable consumer data, for the purpose of maximizing their profits.

98.    Further, Defendants knowingly disclosed Plaintiff's and Meta Pixel Class members' Personal Viewing Information to Meta via the Meta Pixel technology because Defendants intentionally installed and programmed the Meta

Pixel code on their website, knowing that such code would transmit to Meta the titles of the video materials purchased by its customers coupled with their customers' unique identifiers (including FIDs).

99.    Defendants failed to obtain informed written consent from Plaintiff or members of the Classes authorizing Defendants to disclose their Personal Viewing Information to any third party. At no time prior to or during the applicable statutory period did Defendants obtain from any person who purchased prerecorded video material or services on their oldies.com website (including Plaintiff or any members of the Classes) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendants provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

100.    By knowingly disclosing Plaintiff's and members of the Classes' Personal Viewing Information to various third parties, without providing the requisite notice or obtaining the requisite consent, Defendants violated all of these persons' statutorily protected right to privacy in their Personal Viewing Information.

101.    Consequently, Defendants are liable to Plaintiff and members of the

Classes for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the

Classes, seeks a judgment against Defendants as follows:

a)  For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the Classes;

b)  For an order declaring that Defendants' conduct as described herein violated the VPPA;

c)  For an order finding in favor of Plaintiff and the Classes and against Defendants on all counts asserted herein;

d)  For an award of $2,500.00 to Plaintiff and members of the Classes, as provided by 18 U.S.C. § 2710(c);

e)  For an order permanently enjoining Defendants from disclosing the Personal Viewing Information of their customers to third parties in violation of the VPPA;

f)  For prejudgment interest on all amounts awarded; and

g)  For an order awarding reasonable attorneys' fees and costs to counsel for Plaintiff and the Classes pursuant to 18 U.S.C. § 2710(c).

Dated: May 5, 2025

Respectfully submitted,

/s/ *William E. Hoese*
William E. Hoese
Elias A. Kohn
KOHN, SWIFT & GRAF,  P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700
Facsimile: (215) 238-1986
whoese@kohnswift.com
ekohn@kohnswift.com

-and-

Elliot O. Jackson
Florida Bar No. 1034536
HEDIN LLP
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone:   (305) 357-2107
Facsimile:    (305) 200-8801
ejackson@hedinllp.com

*Counsel for Plaintiff and Putative Classes*