# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH MULL, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 2:24-cv-06083-GJP |
| v. | |
| GOTHAM DISTRIBUTING CORPORATION d/b/a OLDIES.COM, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

## <u>SECOND AMENDED CLASS ACTION COMPLAINT</u>

## INTRODUCTION

Joseph Mull ("Plaintiff"), individually and on behalf of all others similarly situated, makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations pertaining specifically to himself or his counsel, which are based on personal knowledge.

## NATURE OF THE CASE

1.     Plaintiff brings this action to redress Defendant's practice of selling, renting, transmitting, and/or otherwise disclosing, to various third parties, records containing the personal information (including names and addresses) of each of its customers, along with detailed information revealing the titles and subject matter of the videos and other audiovisual materials purchased by each customer on the www.oldies.com website (collectively "Personal Viewing Information") in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq*. ("VPPA").

2.     Defendant violated the VPPA with respect to its disclosure of Plaintiff's and Class members' Personal Viewing Information in two ways.

3.     First, Defendant disclosed its customers' Personal Viewing Information to various third-party recipients (data appenders, data aggregators, data brokers, data cooperatives, and list brokers), which then appended that information to a myriad of other categories of personal and demographic data pertaining to those customers.

Defendant re-sells the Personal Viewing Information (with the appended demographic information) to other third parties on the open market.

4.     Second, Defendant systematically transmitted (and continue to transmit today) its customers' Personal Viewing Information to Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc. ("Facebook") using a snippet of programming code called the "Meta Pixel," which Defendant chose to install and configure on its www.oldies.com website (the "Website"). The information Defendant disclosed (and continue to disclose) to Meta via the Meta Pixel includes the customer's Facebook ID ("FID") and the specific title of the prerecorded video content each of its customers purchased on the Website. An FID is a unique sequence of numbers linked to a specific Meta profile.   A Meta profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person).     Entering "Facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds.  Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person.  In the simplest terms, the Meta Pixel installed by Defendant captures and discloses to Meta the Personal Viewing Information of Defendant's customers.

5.      Defendant disclosed and continues to disclose its customers' Personal Viewing Information to these various third parties without asking for, let alone obtaining, its customers' consent to these practices.

6.      The VPPA clearly prohibits what Defendant has done.   Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

7.      Thus, while Defendant profits handsomely from the unauthorized disclosures of its customers' Personal Viewing Information to third parties without providing prior notice to or obtaining the requisite consent from any of its customers, they do so at the expense of its customers' privacy and their statutory rights under federal law.

8.      Defendant's practice of disclosing its customers' Personal Viewing Information in violation of the VPPA has invaded Plaintiff's and the other unnamed Class members' privacy and resulted in a barrage of unwanted junk mail to their home addresses and e-mail inboxes.

9.      In an era when the collection and monetization of consumer data proliferate on an unprecedented scale, it is important that companies are held

accountable for the exploitation of its customers' sensitive information. Defendant chose to disregard Plaintiff's and thousands of other consumers' statutorily protected privacy rights by intentionally and knowingly disclosing their Personal Viewing Information to third parties in the data-aggregation and brokerage marketplace and to Meta. Accordingly, on behalf of himself and the putative Class members defined below, Plaintiff brings this Second Amended Class Action Complaint against Defendant to put a stop to and obtain redress for their violations of VPPA.

## PARTIES

### I.    Plaintiff Joseph Mull

10.    Plaintiff is, and at all times relevant hereto was, a citizen and resident of Arenzville, Illinois.

11.    Plaintiff is, and at all times relevant hereto was (including when purchasing, requesting, and obtaining the prerecorded video material from Defendant's Website), a user of Meta with a Facebook account and profile, which was assigned a unique FID linked only to his email address.

12.    At all times relevant hereto, including when purchasing, requesting, and obtaining the prerecorded video material from Defendant's website, Plaintiff had a Meta account, a Meta profile, and an FID associated with his profile. Plaintiff's Meta profile also contained his first and last name, picture, other biographical information, and it was set to public.

13.     On or about August 3, 2023, Plaintiff purchased prerecorded video material from Defendant's Website by requesting and paying for such material, providing his name, email address, and home address for shipment of such material. Defendant completed its sale of goods to Plaintiff by shipping the prerecorded video material he purchased to the address he provided in his order. Accordingly, Plaintiff requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendant on its website.

14.     Prior to and at the time he purchased prerecorded video material from Defendant's Website, Defendant did not notify Plaintiff that it would disclose the Personal Viewing Information of its customers generally or that of Plaintiff in particular, and Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to third parties. Plaintiff has never been provided any written notice that Defendant sells, rents, licenses, exchanges, or otherwise discloses its customers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information.

15.     Nonetheless, when Plaintiff purchased prerecorded video material from Defendant on its Website, Defendant disclosed to Meta Plaintiff's FID coupled with the specific title of the prerecorded video or video materials he purchased (as well as the product code and the URL where such video is available for purchase), among

other information concerning Plaintiff and the device on which he used to make the purchase. Defendant's disclosure of Plaintiff's FID specifically identified him because inputting www.facebook.com/[Plaintiff's 15-16 digit FID] into the URL bar of any browser would result in Plaintiff's profile being returned as the only result.

16.     Additionally, following Plaintiff's purchases of prerecorded video materials on Defendant's Website, Defendant sold, rented, exchanged for data pertaining to other companies' customers, transmitted, and/or otherwise disclosed Plaintiff's Personal Viewing Information to data appenders, data aggregators, data brokers, data cooperatives, which in turn appended his Personal Viewing Information to a myriad of other categories of personal and demographic data for Defendant to resell that supplemented Personal Viewing Information to aggressive marketing companies, and various third party renters and exchangers or anyone who wanted to acquire it.

17.     Because Defendant disclosed Plaintiff's Personal Viewing Information to Meta and numerous other third parties without prior notice or consent during the applicable statutory period, Defendant violated Plaintiff's rights under the VPPA and invaded his statutorily conferred interest in keeping such information (which bears on his personal affairs and concerns) private.

## II.    Defendant Gotham Distributing Corporation

18.     Defendant Gotham Distributing Corporation ("Defendant Gotham") is

a domestic business corporation existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 60 Portland Road, West Conshohocken, Pennsylvania 19428.

## JURISDICTION AND VENUE

19.    The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

20.    Personal jurisdiction and venue are proper because Defendant maintains its headquarters and principal places of business in Montgomery County, PA, within this judicial District.

## VIDEO PRIVACY PROTECTION ACT

21.    The VPPA prohibits companies (like Defendant) from knowingly disclosing to third parties information that personally identifies consumers (like Plaintiff) as having requested or obtained particular videos or other audio-visual materials.

22.    Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]"  18 U.S.C. § 2710(b)(1).  The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. §

7

2710(a)(4).  It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider."    18 U.S.C. § 2710(a)(1). "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).

23.    Leading up to the VPPA's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes."  *Id.*    Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials because such records offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

24.    Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes."  134 Cong. Rec. S5399 (May 10, 1988).    As Senator Leahy explained at

the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

25.    While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before.  During a more recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

26.    Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they

---

[1]    The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[2]

27.     In this case, however, Defendant deprived Plaintiff and numerous other similarly situated persons of that right by systematically (and surreptitiously) disclosing its Personal Viewing Information to various third parties, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

## BACKGROUND FACTS

### I.     Consumers' Personal Information Has Real Market Value

28.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

---

[2]     Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, franken.senate.gov (Jan. 31, 2012).

[3]     Transcript, *The Information Marketplace* (Mar. 13, 2001), at 8-11, available at https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

29.     Over two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a 26 billion dollar per year online advertising industry in the United States.[4]

30.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable.  Data is currency.  The larger the data set, the greater potential for analysis – and profit.[5]

31.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

32.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like

---

[4]     *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), available at https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.

[5]     Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, available at https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf

[6]     *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), available at http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ .

your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

33.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

34.    Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

---

[7]    N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), available at https://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html#:~:text=It's%20called%20the%20Acxiom%20Corporation,to%20know%20much%2C%20much%20more.

[8]    Letter from Sen. J. Rockefeller IV, Sen. Cmtee. On Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) available at https://www.commerce.senate.gov/services/files/3bb94703-5ac8-4157-a97b-%20a658c3c3061c.

[9]    *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), available at https://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

35.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs.   Thus, when companies like Defendant share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

36.     Disclosures like Defendant's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]

37.     The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12]

---

[10]     *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times (May 20, 2007), available at https://www.nytimes.com/2007/05/20/business/20tele.html.

[11]     *Id*.

[12]     Prepared Statement of the FTC on "Fraud Against Seniors" before the Special Committee on Aging, United States Senate (August 10, 2000).

38.    Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.   Thus, information disclosures like Defendant's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

39.    Defendant is not alone in violating its customers' statutory rights and jeopardizing their well-being in exchange for increased revenue:  disclosing customer information to data aggregators, data appenders, data cooperatives, direct marketers, Meta, and other third parties has become a widespread practice across various consumer products industries.   Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

## II.    Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

40.    As the data aggregation industry has grown, so has consumer concerns regarding personal information.

41.    A survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do protect their privacy online.[14]   As a result, 81 percent of

---

[13]    *Id.*

[14]    *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.

smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

42.     Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.  In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[16]

43.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[17]

---

[15]     *Id.*

[16]     *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), available at https://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

[17]     *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on Monetizing Privacy* (Feb. 27, 2012), available at https://www.enisa.europa.eu/publications/monetising-privacy.

44.     Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18] As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

### III.    Defendant Unlawfully Sells, Rents, Transmits, Or Otherwise Discloses Its Customers' Personal Viewing Information

45.     Defendant owned, operated, and controlled the Website during the relevant time period, up to and including November 2024, as reflected by the Privacy Policy then existing on the Website.[19] Specifically, the Website stated that "[t]he terms "OLDIES.com," "we," and "us" include Gotham Distributing Corporation d/b/a OLDIES.com and our affiliates and subsidiaries. This Privacy Policy explains our **online and offline** information practices, the kinds of information we may collect, how we intend to **use and share that information**, and how you can opt out of a use or correct or change such information."[20]

---

[18]     *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, available at https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf.

[19]     A true and accurate copy of the Privacy Policy existing on Defendant's Website from May 15, 2018 through November 2024 is attached hereto as **Exhibit A,** which was previously available at https://www.oldies.com/about/privacy.cfm.

[20]     *See id.* (emphasis added).

46.     Defendant maintains a vast digital database comprised of its customers' Personal Viewing Information, including the names and addresses of each customer and information reflecting the titles of specific videos and other audio-visual products that each of their customers has purchased.

47.     During the time period relevant to this action, Defendant has monetized these databases by renting, selling, or otherwise disclosing its customers' Personal Viewing Information to data appenders, data aggregators, data brokers, data cooperatives, aggressive marketing companies, and various third party renters and exchangers of this data.

48.     These factual allegations are corroborated by publicly available evidence. For instance, as shown in the screenshot below, the Personal Viewing Information of 212,000 American consumers who purchased Defendant's prerecorded video products, including video cassettes and DVDs, is offered for sale by Defendant in a "data card" posted by Defendant on the website of NextMark, Inc. ("NextMark") at a base price of "$105.00/M [per thousand records]" (10.5 cents each):



*See* **Exhibit B** hereto.

49. The "OLDIES.com Mailing list" that Defendant has advertised for rental, sale, and exchange on NextMark, shown in the screenshot above, contains the Personal Viewing Information of each of the 212,000 consumers whose information appears on the list, including each person's name and address as well as the particular prerecorded audio-visual product(s) they purchased from Defendant's website (i.e., the titles of the video cassettes and DVDs purchased) and the amount of money they spent on those purchases.

50.    The same or a substantially similar "data card" as the one shown above, with the same or similar prices for advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, has been publicly advertised by Oldies.com (formerly known as Nina's Discount Oldies) since as far back as the 2005 and was publicly advertised by Defendant continuously between 2005 and the present, including throughout the relevant time period—thus demonstrating that Defendant was renting, selling, exchanging, and otherwise disclosing all of its customers' Personal Viewing Information (including Plaintiff's and all Class members' Personal Viewing Information) to third parties during the relevant pre-August 2023 time period.

51.    For instance, an archived copy of the Oldies.com's data card was cached by the Wayback Machine Internet Archive (archive.org) on January 2, 2007, reflecting that Nina's Discount Oldies was offering to provide renters access to a mailing list materially similar to the one at issue in this case, which contained the Personal Viewing Information of all 108,016 of its then active and recently expired U.S. customers at a base price of "$100.00/M [per thousand]," (i.e., 10 cents each), as shown in the screenshot below:



*See* **Exhibit C** hereto (available at

https://web.archive.org/web/20070103040924/https://lists.nextmark.com/market?p
age=order/online/datacard&id=57555).

52.     The Nina's Discount Oldies entity continued to offer these data cards

from 2007 until its owners filed a fictitious name certificate identifying that the

Defendant is transacting business in its place as of 2010.  *See* **Exhibit D**.

53.     As evidence that Defendant was offering to provide renters access to mailing lists between 2010 and the filing of this action, Plaintiff's counsel saved a copy of the Oldies.com data card during its pre-suit investigation that was dated June 8, 2019. This data card is entitled "Oldies.com (formerly Nina's Discount Oldies) Mailing List." It reflects that Defendant d/b/a Oldies.com was offering to provide renters access to a mailing list materially similar to the one at issue in this case, which contained the Personal Viewing Information of all 281,428 of its then active and recently expired U.S. customers at a base price of "$105.00/M [per thousand]," (i.e., 10.5 cents each), as shown in the screenshot below:



*See* **Exhibit E**.

54.     Thus, the Website's Privacy Policy, coupled with the fictitious name certificate and 2019 data card, demonstrates that Defendant operated the Website from 2010 through the filing of this Action (including the statutory class period) and coordinated the renting, selling, exchanging, and otherwise disclosing all of its customers' Personal Viewing Information. Defendant received each and every benefit of the profits from this practice.

55.     During the relevant time period, Defendant has rented, sold, and exchanged lists containing its customers' Personal Viewing Information to various third parties interested in acquiring this data, including data appenders, data aggregators, data brokers, data cooperatives, aggressive marketing companies, and various third party renters and exchangers of this data.

56.     Defendant did not seek Plaintiff's or any other customers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) to these third parties, and its customers remain unaware that their Personal Viewing Information and other sensitive data are being sold, rented, and exchanged on the open market in this way.

57.     By renting, selling, exchanging for, or otherwise disclosing lists containing its customers' Personal Viewing Information to third parties, Defendant knowingly violated the VPPA on an enormous scale.

### IV.    Defendant Uses the Meta Pixel to Systematically Disclose Its Customers' Personal Viewing Information to Meta

58.    Additionally, throughout the relevant time period, Defendant violated the VPPA by systematically transmitting Plaintiff's and the Class members' Personal Viewing Information to Meta through the Pixel technology that Defendant intentionally installed on the Website.

### The Meta Pixel

59.    On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta".[21]  Meta is now the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

60.    The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta. This allows companies like Defendant to build detailed profiles about their customers and to serve them with highly targeted advertising.

---

[21]    *See* Facebook, "Company Info," available at https://about.fb.com/company-info./.

61.    Additionally, a Meta Pixel installed on a company's website allows Meta to "match [] website visitors to their respective Facebook User accounts."[22] This is because Meta has assigned to each of their users an "FID" number—a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name[23]—and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor.

62.    The FID is stored in a small piece of code known as a "cookie" that Meta launches and stores in the internet browsers of each Meta accountholder's device(s) to distinguish between website visitors.[24]

63.    As Meta's developer's guide explains, installing the Meta Pixel on a website allows Meta to track actions that users with Meta accounts take on the site.

---

[22]    Meta, "Get Started—Meta Pixel," available at https://developers.facebook.com/docs/meta-pixel/get-started/.

[23]    For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

[24]    Meta, How to Create a Custom Audience from Your Customer List, FACEBOOK FOR BUSINESS, https://www.facebook.com/business/help/471978536642445?id=1205376682832142 (last visited Nov. 11, 2024).

Meta states that "Examples of [these] actions include adding an item to their shopping cart or making a purchase."[25]

64.    The default configuration of the Meta Pixel, which is similar to what Defendant used, enables website visitor tracking because the Meta Pixel automatically detects first-party cookie data from the particular website that the visitor is on and then matches it with third-party cookie data from Meta, such as the c_user cookie that houses a person's FID. [26]

65.    Meta's Business Tools Terms govern the use of Meta's Business Tools, including the Meta Pixel.[27]

66.    Meta's Business Tools Terms state that website operators may use Meta's Business Tools, including the Meta Pixel, to transmit the "Contact Information" and "Event Data" of their website visitors to Meta.

67.    Meta's Business Tools Terms define "Contact Information" as "information that personally identifies individuals, such as names, email addresses, and phone numbers . . . ."[28]

---

[25]    Meta, "About Meta Pixel," available at https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[26]    Meta, *Business Help Center: About cookie settings for the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/471978536642445?id=12053766828321 42 (last visited Nov. 11, 2024).

[27]    Meta, "Meta Business Tools Terms," available at https://www.facebook.com/legal/technology_terms.

[28]    *Id*.

68.     Meta's Business Tools Terms state: "You instruct us to process the Contact Information solely to match the Contact Information against user IDs [e.g., FIDs] ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data."[29]

69.     The Business Tools Terms define "Event Data" as, *inter alia*, "information that you share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps, and purchases of your products."[30]

70.     Website operators use the Meta Pixel to send information about visitors to their websites to Meta.  Every transmission to Meta accomplished through the Meta Pixel includes at least two elements: (1) the website visitor's FID and (2) the webpage's URL triggering the transmission.

71.     Depending on the Meta Pixel's configuration, a website may also send Event Data to Meta.  Defendant installed the Meta Pixel on the Website between 2015 and 2023 and configured it to send Event Data to Meta, including Page View, Search, Purchase, and Initiate Checkout, among others.

---

[29]     *Id.*

[30]     *Id.*

72.     When website operators make transmissions to Meta through the Meta Pixel, none of the following categories of information are hashed or encrypted: the visitor's FID, the website URL, or the Event Data.

73.     Every website operator installing the Meta Pixel must agree to the Meta Business Tools Terms.[31]

74.     Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

75.     Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed.  Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

76.     Simply put, if a company chooses to install the Meta Pixel on their website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track [] the people and type of actions

---

[31]      *See id.*

they take,"[32] including, as relevant here, the specific prerecorded video material that they purchase on the website.

### A. Defendant Knowingly Uses the Meta Pixel to Transmit the Personal Viewing Information of Its Customers to Meta

77.    To purchase prerecorded video material from Defendant's Website, a person must provide at least his or her name, email address, billing address, and credit or debit card (or other form of payment) information.

78.    During the purchase process on Defendant's website, Defendant uses— and has used at all times relevant hereto—the Meta Pixel to disclose to Meta the unencrypted FID of the person who made the purchase alongside the specific title of video material that the person purchased (as well as the URL where such video material is available for purchase).

79.    In order to take advantage of the targeted advertising and other informational and analytical services offered by Meta, Defendant intentionally programmed its Website (by following step-by-step instructions from Meta's website) to include the Meta Pixel code, which systematically transmits to Meta the FID of each person with a Meta account who purchases prerecorded video material

---

[32]    Meta, "Retargeting: How to Advertise to Existing Customers with Ads on Facebook," available at https://www.facebook.com/business/goals/retargeting?checkpoint_src=any.

from Defendant's website, along with the specific title of the prerecorded video material that the person purchased (including the product code).

80.    With only a person's FID and the title of the prerecorded video material (product code or URL where such material is available for purchase) that the person purchased from Defendant's Website—all of which Defendant knowingly and systematically provide to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the title of the specific prerecorded video material that the person purchased (and thus requested and obtained).  This can be accomplished simply by accessing the URL www.facebook.com/ and inserting the person's FID after the backslash.

81.    Even Meta itself recognizes that with someone's FID, any ordinary person can "see your Facebook profile, including any public information."[33]

82.    Defendant's practices of disclosing the Personal Viewing Information of its customers to Meta continued unabated for the duration of the two-year period preceding the filing of this action.    At all times relevant hereto, whenever Plaintiff or any other person purchased prerecorded video material from Defendant's website, Defendant disclosed to Meta (*inter alia*) the specific title of the video material that was purchased (including the product code of the product and URL where such

---

[33]    Facebook, *How Usernames and User Ids Are Used on Facebook Profiles*, https://www.facebook.com/help/211813265517027/ (last visited October 10, 2025).

material is available for purchase), along with the FID of the person who purchased it (which, as discussed above, uniquely identified Plaintiff and each putative class member).

83.    Any ordinary person can connect Plaintiff or putative class members to the specific video products they purchased on Defendant's Website in several other ways.

84.    First, Defendant systematically communicates specific event data to Meta that any ordinary person can identify by simply observing the Website's live interactions with third parties via the website's network activity panel.  Accessing the network panel is made possible by simultaneously pressing the "Command," "Option," and "I" keys on a Mac keyboard and the "Ctrl," "Shift, "I" keys on a Windows keyboard.

85.    To illustrate Defendant's disclosures to Meta, Plaintiff's counsel took screenshots during its investigation to demonstrate an exemplar of the disclosure that would have occurred during Plaintiff's checkout experience from the network panel.

86.    Plaintiff would have first appeared on the following page to select his product of choice:



87.    Upon clicking the "Add to Cart" button shown above, the network panel reveals that Defendant communicated to Meta that Plaintiff requested to add the "Witchtrap" DVD to his cart (through the "Subscribed" Event Code) and identified the specific title of the prerecorded video and its product code: 70946W. This Personal Viewing Information was transmitted to Meta as seen in the exemplar below:

31



88.    Further down the network panel in the same transmission demonstrates that Plaintiff's cookie data—where his FID is stored—was communicated to Meta in the form of c_user:[XXXXXXXXXXXXXXXX]. Reproduced in the exemplar below is the c_user code for undersigned counsel, but would have and did reflect Plaintiff's c_user or FID value when he made his purchase:



89.    The webpage itself then required that Plaintiff complete his transaction by showing him the following page:



90.    Upon clicking the "Begin Checkout" button, Defendant communicated to Meta the "Initiate Checkout" Event Code via the Meta Pixel. This communication also included Plaintiff's FID, the product code, title of the product, and URL where the product is available for purchase.

91.    Plaintiff was then required to log into his account to checkout or use PayPal to complete his purchase as shown in the exemplar below:



92.     Upon clicking either button, Defendant communicated to Meta, one or more Event Codes, including the Page View event, which included Plaintiff's FID, the product code, title of the product, and URL where the product is available for purchase.

93.     To checkout, Plaintiff was taken to the following page:



94.    After inputting all required information, Defendant communicated to Meta the "Purchase" Event Code via the Meta Pixel—an Event Code that also included Plaintiff's FID, the product code, title of the product, and URL where the product is available for purchase. But, at no point in the checkout process was Plaintiff put on notice that his Personal Viewing Information was being communicated to Meta, let alone that Defendant had a Privacy Policy that governed online interactions with the Website.

95.    At each of these steps, any ordinary person could watch the communications from Defendant's Website to Meta via the network panel by pressing three simple keys simultaneously—"Command" or "Ctrl", "Option" or "Shift", and "I"—virtually as easy as someone copy and pasting text from one place to another by using the "Ctrl", "c", and "v" keys on a Windows keyboard or the "Command," "c", and "v" keys on a Mac keyboard.

96.    To further illustrate how simple this process is, one can look back at one of the first social media platforms, Myspace, which had over 250 million users before it disappeared.[34] One key feature of Myspace was its MySpace profile editor tool, which was "freeform enough to allow inline style attributes, tables, embedded widgets built in Flash or JavaScript, and just about anything else that could be expressed in HTML."[35] Plainly put, it was simple enough for millions of users to create falling letter backgrounds and embed songs on their profile, among other things, by taking "advantage of HTML and CSS, or access to code snippets that could be blindly copied and pasted" with only rudimentary knowledge, because of a mistake by Myspace's lead developers.[36] Because millions of Americans have been

---

[34]    Kate Conger, *Myspace, Once the King of Social Networks, Lost Years of Data from Its Heyday*, N.Y. Times (Mar. 19, 2019), https://www.nytimes.com/2019/03/19/business/myspace-user-data.html.

[35]    Code Academy, *MySpace and the Coding Legacy it Left Behind* (Feb. 14, 2020), https://www.codecademy.com/resources/blog/myspace-and-the-coding-legacy

[36]    *See id*. (referencing JULIA ANGWIN, STEALING MYSPACE: THE BATTLE TO CONTROL THE MOST POPULAR WEBSITE IN AMERICA 60 (2009)).

able to understand and navigate HTML, code, and network traffic for decades, any ordinary user could easily press three keys to access the HTML, code, and network traffic to uncover Defendant's surreptitious disclosures to Meta of its customers' Personal Viewing Information.

97.     Second, Defendant systematically communicates specific event data to Meta that any ordinary person can identify by simply downloading the Meta Pixel helper, a free online tool. This tool easily displays the specific Event Codes configured by the Meta Pixel and communicates them in plain English, as reflected in the exemplar below:



98.     At all times relevant hereto, Defendant knew the Meta Pixel was disclosing its customers' Personal Viewing Information to Meta.

99.     Although Defendant could easily have programmed its Website so that none of its customers' Personal Viewing Information is disclosed to Meta, Defendant instead chose to program its Website so that all of its customers' Personal Viewing Information is disclosed to Meta.

100. Before transmitting its customers' Personal Viewing Information to Meta, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

101. By intentionally disclosing to Meta Plaintiff's and its other customers' FIDs along with the titles of the specific video materials that they each purchased (including the product codes and URLs where such products are available for purchase), without any of their consent to these practices, Defendant knowingly violated the VPPA on an enormous scale.

## CLASS ACTION ALLEGATIONS

102. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of himself and seeks to represent two classes of similarly situated persons (the "Classes"), defined as follows:

**Data Brokerage Class**: All persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material from Defendant and had their Personal Viewing Information disclosed by Defendant to a third party.

**Meta Pixel Class**: All persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material from the oldies.com Website and had their Personal Viewing Information disclosed by Defendant to Meta via the Meta Pixel.

103. Excluded from the Classes are any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

104.    Members of each Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Classes number in at least the tens of thousands.   The precise number of members in each Class and their identities are unknown to Plaintiff at this time but may be determined through discovery.   Members of each Class may be notified of the pendency of this action by mail and/or publication through the membership records from Defendant.

105.    Common questions of law and fact exist for all Classes and predominate over questions affecting only individual class members.  Common legal and factual questions include but are not limited to (a) whether Defendant knowingly disclosed Plaintiff's and Class members' Personal Viewing Information to a third party; (b) whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and (c) whether Plaintiff and the Classes are entitled to a statutory damage award of $2,500, as provided by the VPPA.

106.    The named Plaintiff's claims are typical of the claims of the Classes in that the Defendant's conduct toward the putative class is the same.  That is, Defendant knowingly disclosed the Personal Viewing Information of the members of each of the Classes to third parties in the same way.   Further, the named Plaintiff and members of the Classes all suffered invasions of their statutorily protected right to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of

Defendant's uniform and wrongful conduct in intentionally disclosing their Personal
Viewing Information to third parties.

107.    Plaintiff is an adequate representative of each of the Classes because
he is interested in the litigation; his interests do not conflict with those of the Classes
he seeks to represent; he has retained competent counsel experienced in prosecuting
class actions; and he intends to prosecute this action vigorously.    Plaintiff and his
counsel will fairly and adequately protect the interests of all members of the Classes.

108.    The class mechanism is superior to other available means for the fair
and efficient adjudication of Class members' claims.  Each individual Class member
may lack the resources to undergo the burden and expense of individual prosecution
of the complex and extensive litigation necessary to establish Defendant's liability.
Individualized litigation increases the delay and expense to all parties and multiplies
the burden on the judicial system presented by this case's complex legal and factual
issues.    Individualized litigation also presents a potential for inconsistent or
contradictory judgments.   In contrast, the class action device presents far fewer
management difficulties and provides the benefits of single adjudication of the
common questions of law and fact, economy of scale, and comprehensive
supervision by a single court on the issue of Defendant's liability.  Class treatment
of the liability issues will ensure that all claims and claimants are before this Court
for consistent adjudication of the liability issues.

## CLAIM FOR RELIEF

**Violation of the Video Privacy Protection Act, (18 U.S.C. § 2710)**
**(By Plaintiff, Individually and on Behalf of Members of Both Classes, Against Defendant)**

109.    Plaintiff repeats the allegations asserted in the foregoing paragraphs as if fully set forth herein.

110.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

111.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service providers" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of selling and delivering prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide from the Website.

112.    As set forth in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiff and members of the Classes are each a "consumer" within the meaning of the VPPA because they each purchased

prerecorded video material from Defendant and such material was sold and delivered to them by Defendant.

113.    As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Personal Viewing Information that Defendant transmitted to the third parties alleged above constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and members of the Classes by their unique FID as an individual who purchased, and thus "requested or obtained," specific prerecorded video material from Defendant via its Website.

114.    Defendant knowingly disclosed Plaintiff's and the Data Brokerage Class members' Personal Viewing Information to data appenders, data aggregators, data brokers, data cooperatives, , which in turn appended the Personal Viewing Information to a myriad of other categories of personal and demographic data for Defendant to resell that supplemented Personal Viewing Information to aggressive marketing companies, and various third party renters and exchangers or anyone who wanted to acquire it.  Defendant made such disclosures in exchange for money and/or other valuable consumer data, for the purpose of maximizing its profits.

115.    Further, Defendant knowingly disclosed Plaintiff's and Meta Pixel class members' Personal Viewing Information to Meta via the Meta Pixel

technology because Defendant intentionally installed and programmed the Meta Pixel code on its Website, knowing that such code would transmit to Meta the titles of the video materials (including product codes and URLs where such products are available for purchase) purchased by its customers coupled with its customers' unique identifiers (including FIDs).

116.    Defendant failed to obtain informed written consent from Plaintiff or members of the Classes authorizing Defendant to disclose their Personal Viewing Information to any third party. At no time prior to or during the applicable statutory period did Defendant obtain from any person who purchased prerecorded video material or services on its Website (including Plaintiff or any members of the Classes) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendant provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

117.    By knowingly disclosing Plaintiff's and members of the Classes' Personal Viewing Information to various third parties, without providing the

requisite notice or obtaining the requisite consent, Defendant violated all of these persons' statutorily protected right to privacy in their Personal Viewing Information.

118.    Consequently, Defendant is liable to Plaintiff and members of the Classes for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Classes, seeks a judgment against Defendant as follows:

a) For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the Classes;

b) For an order declaring that Defendant's conduct as described herein violated the VPPA;

c) For an order finding in favor of Plaintiff and the Classes and against Defendant on all counts asserted herein;

d) For an award of $2,500.00 to Plaintiff and members of the Classes, as provided by 18 U.S.C. § 2710(c);

e) For an order permanently enjoining Defendant from disclosing the Personal Viewing Information of its customers to third parties in violation of the VPPA;

f) For prejudgment interest on all amounts awarded; and

g) For an order awarding reasonable attorneys' fees and costs to counsel for Plaintiff and the Classes pursuant to 18 U.S.C. § 2710(c).

Dated: October 14, 2025

Respectfully submitted,

*/s/ Elliot O. Jackson*
Elliot O. Jackson
Florida Bar No. 1034536
HEDIN LLP
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone:   (305) 357-2107
Facsimile:    (305) 200-8801
ejackson@hedinllp.com

-and-

William E. Hoese
Elias A. Kohn
KOHN, SWIFT & GRAF,  P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700
Facsimile: (215) 238-1986
whoese@kohnswift.com
ekohn@kohnswift.com

*Counsel for Plaintiff and Putative
Classes*